UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ERNESTO KARAM GARCIA, | § | No.  5:15-CV-1116-DAE |
| MIGUEL ANGEL LEYVA URQUIA, | § | |
| SALVADOR RIO DE LA LOZA | § | |
| POSTIGO, COMERCIALIZADORA | § | |
| Y CONSTRUCTORA MIGSAL S.A. | § | |
| DE C.V., ECON DESARROLLADOR | § | |
| INMOBILIARO S.A. DE C.V., and | § | |
| DESARROLLADORA DE | § | |
| ILUSIONES S.A. DE C.V., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| LION MEXICO CONSOLIDATED | § | |
| L.P., CLARION PARTNERS LLC, | § | |
| JAMES CHRISTIAN HENDRICKS, | § | |
| RONALD SCOTT BROWN, and | § | |
| ONAY SAFIYA PATRICE PAYNE, | § | |
| | § | |
| Defendants. | § | |

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT (DKT. # 71)

Before the Court is a Motion for Summary Judgment filed by:

(1) Corporate Defendants Lion Mexico Consolidated ("LMC")—not to be

confused with non-party entity Lion Mexico Fund L.P. ("LMF")—and Clarion

Partners LLC ("Clarion") (collectively, with LMC, "Corporate Defendants"); and

(2) Individual Defendants James Christian Hendricks ("Hendricks"), Ronald Scott

1

Brown ("Brown"), and Onay Safiya Payne ("Payne") (collectively, "Individual

Defendants") on January 1, 2018.  (Dkt. # 71.)

On September 7, 2018, the Court held a hearing on the motion.  At the

hearing, Jaime Peña, Esq. represented Plaintiffs and Richard T. Marooney, Esq.

represented Defendants.  The motion is fully briefed and ripe for review.

After careful consideration of the memoranda and exhibits filed in

support of and in opposition to the motion, as well as the arguments advanced at

the hearing, the Court—for the reasons that follow—**GRANTS** Corporate

Defendants and Individual Defendants' (collectively, "Defendants") Motion for

Summary Judgment.  (Id.)

<u>BACKGROUND</u>

I.    <u>The Parties</u>

The plaintiffs in this case are comprised of: (1) three Mexican

nationals—Ernesto Karam Garcia ("Karam"), Miguel Angel Leyva Urquia

("Leyva"), and Salvador Rio De La Loza Postigo ("De La Loza") (collectively,

"Individual Plaintiffs"); and (2) three corporate entities—Comercializadora Y

Constructor Migsal, S.A. de C.V. ("Migsal"), Econ Desarrollador Inmobiliario,

S.A. de C.V. ("Econ"), and Desarrolladora De Ilusiones, S.A. de C.V. ("Ilusiones")

(collectively, "Corporate Plaintiffs") (collectively, with Individual Plaintiffs,

"Plaintiffs").  (Dkt. # 1.)  Individual Plaintiffs collectively own and control Migsal,

Econ, and Ilusiones, through which they invest in and develop real estate in Mexico.  (Dkt. # 71 at 10; Dkt. # 71-2 at 12–16.)

Defendant Clarion is a New York-based real estate investment company that creates and invests in certain real estate funds.  (Dkt. # 71 at 6, 10; Dkt. # 71-1 at 3–4; Dkt. # 71-4 at 3–4.)  One such fund is Lion Mexico Fund L.P. (or "LMF"), which Clarion created in 2006 to invest in Mexican real estate projects.[1]  (Dkt. # 71 at 6; Dkt. # 71-4 at 5)  LMF is managed through Corporate Defendant LMC.  ("SAC," Dkt. # 39 at ¶ 24.)  Individual Defendants Hendricks, Brown, and Payne are current or former executives of LMF.[2]

II.   The Punta Mar Real Estate Project

Sometime around June of 2007, LMF began exploring whether to invest in a real estate project called the Punta Mar (the "Punta Mar Project" or the "Project"), consisting of condominiums for use as vacation homes in Acapulco, Mexico, which Plaintiffs owned and controlled through a Mexican land trust, referred to here as the Mifel Trust ("the Mifel Trust").  (Id. at ¶¶ 27–29; Dkt. # 71 at 11.)  At the time, additional capital was required to continue the Project's

_____

[1] Of which the Punta Mar project was one of about fifty. (Dkt. # 71 at 11, Dkt. # 71-1 at 11.)

[2] Hendricks is the former Portfolio Manager of Lion; Payne was deputy Portfolio Manager until 2011, when she replaced Hendricks as Portfolio Manager; Brown is the former Chief Financial Officer of Lion. (Dkt. # 71 at 11.)

development, capital that LMF was interested in potentially providing.  (Dkt. # 71 at 11–12.)  Lacking office space and personnel in Mexico, LMF entered into an independent contractor relationship with a company called DTZ Rockwood ("Rockwood")[3] to advise LMF about business opportunities in Mexico.  (Id. at 12; Dkt. # 71-4 at 10–11.)  Rockwood's responsibilities included "sourcing investments, conducting due diligence[,] and overseeing projects once an investment was made."  (Dkt. # 71 at 12.)  It was Rockwood who had the initial conversations with Individual Plaintiffs about LMF's investment in the Punta Mar Project.  (Id.; Dkt. # 71-4 at 8–9.)

On July 3, 2007, LMF and Corporate Plaintiff Econ executed a non-binding (other than as to exclusivity) Letter of Intent ("LOI"), governed by Mexican law, outlining the potential terms of LMF's investment, including the provision that LMF would maintain "sole and absolute discretion" as to whether to invest and the nature of the investment.  (Dkt. # 71 at 12; Dkt. # 71-11, Ex. 7 at 2, 8.)  Although the LOI reflected a conception of the transaction as an equity investment, the ultimate transaction ended up being a debt investment.  Thus, on October 9, 2007, LMF and Econ executed a series of agreements whereby: (1) LMC provided the Mifel Trust an unsecured loan of just more than $21 million; (2) Plaintiffs maintained control over project management and operation; and

---

[3] Rockwood is not a party to this suit.

(3) Individual Plaintiffs guaranteed project performance and loan repayment.  (Dkt. # 71 at 12–13; Dkt. # 71-12, Ex. 8; Dkt. # 71-13, Ex. 9; Dkt. # 71-14, Ex. 10.)

Shortly thereafter, the Punta Mar Project needed and received another infusion of money.  (Dkt. # 71 at 13.)  Yet the project continued to struggle.  (Id.)  Eventually, on September 26, 2008, LMC, LMF, Migsal, Ilusiones, and Individual Plaintiffs signed a Memorandum of Understanding ("MOU"), requiring the execution of restructuring documents within six weeks and providing LMC and LMF stronger creditor protections.  (Id.)  These protections included stringent requirements before the project would be advanced more money and the "right to accelerate the maturity" of the loans if the restructuring documents were not signed.  (Id. at 13–14; Dkt. # 71-16, Ex. 12 at 10.)

But no restructuring ever occurred.  (SAC at ¶¶ 46, 48; Dkt. # 71 at 14.)[4]  And in 2009, the Project, as then constituted, essentially collapsed amid non-existent sales, cost increases, lack of funds, and unpaid contractors.  (Dkt. # 71 at 14.)[5]  Helping contribute to the Project's demise, a project creditor, Inbursa bank, who predated Lion's involvement in the project, declared its loan in default

---

[4] Plaintiffs allege they refused to restructure based on a "perceived change in attitude" on Defendants' part and "requested clarification of their status as equity partners based on past representations."  (SAC at ¶ 48.)

[5] Defendants further allege that Plaintiffs were unable to account for millions in expenditures and had refused to provide invoices and documentation to verify loaned money was spent as intended.  (Dkt. # 71 at 14; Dkt. # 71-1 at 8, 15.)

and obtained foreclosure judgment on the property.  (Dkt. # 71 at 14; Dkt. # 71-2 at 72; Dkt. # 71-4 at 39–42.)  LMF soon also learned that an entity called Quelra claimed to own 20 units at the Project, contrary to a specific representation made by Plaintiffs.  (Dkt. # 71 at 14; Dkt. # 71-4 at 22–23.)

III.    Defendants' Takeover of the Punta Mar Project

On February 16, 2010, LMC gave written notice of loan acceleration to Plaintiffs.  (Dkt. # 71 at 15.)  LMC stated three reasons for the acceleration: (1) LMC's belief the Plaintiffs had been dishonest about Quelra's claims as to the 20 units at the Punta Mar Project; (2) Plaintiffs' failure to sign the restructuring agreements as they had promised and as required by the MOU; and (3) Plaintiffs' inability to produce evidence about the use of at least $1 million that was loaned by LMC to the project.  (Id.; Dkt. # 71-17, Ex. 13.)  In addition to providing notice of loan acceleration, LMC purchased Inbursa's interest in the Project to avoid Inbursa from foreclosing on the units.  (Dkt. # 71 at 15; Dkt # 71-2 at 72; Dkt. # 71-3 at 11.)  By accelerating the loans and acquiring Inbursa's interest, LMC gained effective control of the project, allowing it to foreclose on Plaintiffs' beneficial rights in the land trusts as well as the property securing the Inbursa loan.  (Dkt. # 71 at 15; Dkt. # 71-4 at 43–46.)

After taking over the Project, LMC's top priority was settling open issues with purported purchasers of the condo units.  (Dkt. # 71 at 15; Dkt. # 71-

1 at 20.)  This process required sifting through contracts and payment records to determine who had actually paid, who still owed money, and who had rightful title to various units.  (Dkt. # 71 at 15; Dkt. # 71-4 at 49, 56.)  To do so, Lion developed a protocol requiring buyers to prove they had properly executed contracts, that they had made payment and were capable of making or already made any remaining payments, and that no other buyers claimed an interest in the same unit.  (Id.)

Of particular relevance, one such purported buyer was Jesus Murillo Karam ("Murillo").  (Dkt. # 71 at 7–8.)  Murillo would later become the Attorney General of Mexico.[6]  Murillo originally entered into a Promise of Sale Agreement ("Sale Agreement") with Plaintiffs to purchase a condo at the Punta Mar Project for 4.4 million in Mexican Pesos.  (Id. at 16; Dkt. # 71-18, Ex. 14 at 4, 9.)  As required by the Sale Agreement, on the same day Murillo made an initial payment of 500,000 Pesos, which Plaintiff Leyva authorized.  (Dkt. # 71 at 16; Dkt. # 71-19, Ex. 15.)  About a month later, Murillo made a further payment of 2.5 million Pesos, which is confirmed by a receipt signed by Plaintiffs Karam and De La Loza.  (Dkt. # 71 at 16; Dkt. # 71-2 at 43–44; Dkt. # 71-20, Ex. 16.)  The next month, Murillo executed a Letter of Agreement with Plaintiffs, acknowledging a

---

[6] Murillo figures prominently in Plaintiffs' allegations, as it is this transaction with Defendants that Plaintiffs allege constituted a bribe, one of the alleged predicate acts underlining their civil RICO claims.  (See SAC at ¶¶ 64, 108; Dkt. # 76 at 33–34).

remaining balance of 1.4 million Pesos.  (Dkt. # 71 at 16; Dkt. # 71-21, Ex. 17.)  In light of this record, Lion transferred title to Murillo in August of 2012 in exchange for a payment of 1.415 million Pesos.  (Dkt. # 71 at 16; Dkt. # 71-22, Ex. 18; Dkt. # 71-23, Ex. 19.)

IV.   Plaintiffs' Mexico-Based Lawsuits Challenging Lion's Takeover of the Punta Mar Project

Amongst a litany of civil suits over ownership of property at the Punta Mar Project, Plaintiffs have pursued at least four lawsuits in Mexico against one or more of the Defendants in this case, which Plaintiffs filed in response to and challenging Defendants' foreclosure and takeover actions.  (Dkt. # 71 at 17; Dkt. # 7-8, Ex. 4.)  Two of the four cases—one challenging the grounds on which LMC accelerated the loans and foreclosed on the Project and another alleging fraud in connection with foreclosing on the Inbursa loan—have been dismissed in favor of Defendants.  (Dkt. # 72 at 2–4; Dkt. # 72-1, Ex. A at 36; Dkt. 72-2, Ex. B at 76.)  The other two cases—one alleging a breach of contract in connection with the July 3, 2007 LOI and another alleging breach of contract in connection with one of the October 9, 2007 agreements—remain pending.  (Dkt. # 72 at 4–5; Dkt. # 72-3, Ex. C at 14; Dkt. # 72-4, Ex. D at 2–3.)

V.   The Instant Action

Plaintiffs commenced this action on December 14, 2015.  (Dkt. # 1.)  Plaintiffs filed their operative Second Amended Complaint ("SAC") on October

21, 2016.  (Dkt. # 39.)  In the SAC. Plaintiffs allege a mixture of federal and state

law claims related to Defendants' conduct both during and in the aftermath of the

transactions related to the Punta Mar development project.  (Id.)  Plaintiffs' three

federal claims are for violations of the Racketeer Influenced and Corrupt

Organizations Act (the "RICO Act"): (1) a claim under 18 U.S.C. § 1962(b) for

acquiring or maintaining an interest in or control of an enterprise through a pattern

of racketeering conduct; (2) a claim under 18 U.S.C. § 1962(c) for conducting the

affairs of an enterprise through a pattern of racketeering conduct; and (3) a claim

under 18 U.S.C. § 1962(d) for conspiracy to violate the substantive prohibitions of

the RICO Act.  (Id.)  Plaintiffs further asserted claims for fraud, tortious

interference with contract, unjust enrichment, conversion, and civil conspiracy

under Texas common law.  (Id.)

On December 16, 2016, Defendants moved for a judgment on the

pleadings.  (Dkt. ## 42, 43.)  On September 11, 2017, this Court granted in part

Defendants' Motion for Judgment on the Pleadings as to Plaintiffs' claims for

tortious interference with contract, unjust enrichment, and conversion.  (Dkt. # 56.)

Accordingly, the only claims that remain are Plaintiffs' RICO Act, fraud, and civil

conspiracy claims remain.

On January 18, 2018, Defendants moved for summary judgment on

Defendants' remaining claims.  (Dkt. # 71.)  That motion is currently before the

Court.  Plaintiffs filed a response in opposition to Defendants' Motion for

Summary Judgment on March 5, 2018 (Dkt. # 76), and Defendants filed a reply

brief on March 23, 2018 (Dkt. # 78).  The Court held a hearing on this matter on

September 7, 2018.

LEGAL STANDARD

Summary judgment is proper if "there is no genuine dispute as to any

material fact" and the moving party "is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P. Enters., L.L.C., 756 F.3d 875,

880 (5th Cir. 2014).  A dispute is genuine only "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the

absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986).  If the moving party meets this burden, the nonmoving party must

come forward with specific facts that establish the existence of a genuine issue for

trial.  Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703,

706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619,

621 (5th Cir. 2000)).  "Where the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

        In deciding whether a fact issue has been created, the court must draw

all reasonable inferences in favor of the nonmoving party, and it "may not make

credibility determinations or weigh the evidence."  Tiblier v. Dlabal, 743 F.3d

1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133, 150 (2000)).  At the summary judgment stage, evidence need not be

authenticated or otherwise presented in an admissible form.  See Fed. R. Civ. P.

56(c); Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir.

2017).  However, "[u]nsubstantiated assertions, improbable inferences, and

unsupported speculation are not sufficient to defeat a motion for summary

judgment."  United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012)

(quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

## DISCUSSION

        Defendants raise several arguments in support of their Motion for

Summary Judgment.  They first raise several quasi-jurisdictional grounds: (1) the

act of state doctrine applies because "plaintiffs' claims require this Court to stand

in judgment of official acts of the Mexican government"; (2) international comity

applies because Plaintiffs' requested relief "would undermine judgments in prior

civil and criminal litigations in Mexico and interfere with ongoing litigation in

Mexico involving the same parties"; and (3) the doctrine of *forum non conveniens* applies because the claims have "almost no connection to the Western District of Texas and everything to do with Mexico."  (Dkt. # 76 at 27, 29, 32.)

In addition to the quasi-jurisdictional grounds, Defendants argue that they are entitled to summary judgment on Plaintiffs' RICO claims for four primary reasons: (1) "Plaintiffs cannot prove a pattern of racketeering activity"; (2) "Plaintiffs cannot show a distinct enterprise under § 1962(c); (3) "Plaintiffs cannot prove the elements of § 1962(d)" because they cannot prove a substantive RICO violation; and (4) "Plaintiffs cannot prove RICO Injuries or Causation."  (Id. at 35, 43, 45.)

Further, Defendants contend that they are entitled to summary judgment on Plaintiffs' state law claims for fraud and civil conspiracy.  As to these claims, Defendants argue that summary judgment is proper on two grounds: the claims are unsupported by the evidence and are untimely.  (Id. at 51, 54.)  The Court addresses each argument in turn.

I.      Quasi-Jurisdictional Issues

   A.      Act of State Doctrine

The act of state doctrine precludes American courts from deciding the merits of a case if in doing so it "would need to judge the validity of the public acts of a sovereign state performed within its own territory."  Callejo v. Bancomer,

S.A., 764 F.2d 1101, 1113 (5th Cir. 1985.)  "When determining whether the act of state doctrine limits adjudication, . . . [courts look to] any governmental acts whose validity would be called into question by adjudication of the suit.'"  Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines, 965 F.2d 1375, 1387–88 (5th Cir. 1992) (quoting Callejo, 764 F.2d at 1113).

　　　　　Defendants claim that the act of state doctrine applies to Plaintiffs' bribery claims under the RICO Act.  Those claims allege that several Mexican officials, including the Attorney General and a prosecutor, accepted bribes to pursue the arrest and detention of the Plaintiffs.  (SAC at ¶¶ 65, 68–69).  The Attorney General of Mexico is a sovereign official under the act of state doctrine. See D'Angelo v. Petroleos Mexicanos, 422 F. Supp. 1280, 1290 (D. Del. 1976). Decisions to issue arrest warrants also constitute acts of state.  Nocula v. UGS Corp., 520 F.3d 719, 728 (7th Cir. 2008)  ("The decision of a foreign sovereign to exercise its police power through the enforcement of its criminal laws plainly qualifies as an act of state.")  Because Plaintiffs' bribery allegations depend on this Court finding that the official acts of Mexico's Attorney General, a Mexican prosecutor, and Mexican court officials were improper, Defendants argue that summary judgment should be granted to Defendants on these claims. (Dkt. # 71 at 29.)

Contrary to Defendants' assertion, no such finding is required by the Court. The essence of bribery is that the official acts were done pursuant to an improper motive, not that the acts themselves were invalid, improper, or otherwise contrary to law. An official "is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid." City of Columbia v. Omni Outdoor Advert., Inc., 499 U.S. 365, 378 (1991). "A valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability." United States v. Biaggi, 909 F.2d 662, 683 (2d Cir. 1990). "Intent is the determinant." United States v. Wright, 665 F.3d 560, 568 (3d Cir. 2012.) Therefore, the Court need not find the purported acts to be invalid to find that a bribe occurred. The Court only needs to find that something of value was offered and accepted with the intent that it influence official action. Because only the motive for, not the validity of, foreign sovereign acts is at issue, the act of state doctrine does not apply. W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l, 4930 U.S. 400, 409 (1990).

Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment as to this basis.

B.   International Comity

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation.

14

Hilton v. Guyot , 159 U.S. 113, 164 (1895).  Courts often apply comity to dismiss

cases in deference to a foreign tribunal's final judgment and in light of parallel

foreign proceedings.  Ungaro-Benages v. Dresder Bank AG, 379 F.3d 1227,

1238 (11th Cir. 2004) (collecting cases).  A decision to abstain from exercising

jurisdiction based on international comity "does not rest on a mechanical checklist,

but on a careful balancing of important factors . . . as they apply in a given case,

with the balance weighed heavily in favor of the exercise of jurisdiction."  Cone

Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 16 (1983).   International

comity is an affirmative defense; therefore, Defendants have the burden of proving

that it applies.  Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA

de CV, 347 F.3d 589, 594 (5th Cir. 2003).

   Defendants argue this case should be dismissed based on international

comity because a variety of parallel proceedings have been or are being conducted

in Mexico related to the events underlying this suit.  But "[t]he existence of a

parallel action in an adequate foreign jurisdiction must be the beginning, not the

end, of a district court's determination of whether abstention is appropriate."

Royal & Sun All. Ins. Co. of Can v. Century Int'l Arms, Inc., 466 F.3d 88, 95 (2d

Cir. 2006).  Their existence "does not negate the district courts' 'virtually

unflagging obligation . . . to exercise the jurisdiction given them.'"  Id. at 92

(quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800,

817 (1976)).  "The task of a district court evaluating a request for dismissal based on a parallel foreign proceeding is not to articulate a justification for the exercise of jurisdiction, but rather to determine whether exceptional circumstances exist that justify the surrender of that jurisdiction."  Id. at 93.

Here, the Court finds no such exceptional circumstances exist.  A decision on the merits in Plaintiffs' favor would not upset or frustrate the results in any of those Mexican proceedings.  Plaintiffs are asking for distinctly different remedies related to distinctly different damages, based in large part on distinctly different conduct.  In the Mexican proceedings, Plaintiffs were asking essentially to void the takeover of the Punta Mar Project, based on allegations of fraud and breach of contract.  (Dkt. # 76 at 2–5.)  In the present case, Plaintiffs are asking for money damages to make them whole for their loss of unrelated American business interests, based on allegations of fraud, bribery, threats, and extortion.  (See SAC at ¶¶ 106 –36.)  On these facts, Defendants have not met their burden of demonstrating that sufficient special circumstances exist to warrant refusing jurisdiction.  Defendants' Motion for Summary Judgment is therefore **DENIED** as to this basis.

C.    Forum Non Conveniens

Dismissal for *forum non conveniens* requires there to be an available and adequate forum and various private and public factors to support dismissal.

16

Vasquez v. Bridgestone/Firestone, Inc., 325 F.3d 665, 671 (5th Cir. 2003).  In order for a forum to be adequate, the parties must "not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American Court."  Baumgart v. Fairchild Aircraft Corp., 981 F.2d 824, 835 (5th Cir. 1993) (quoting In re Air Crash Disaster, 821 F.2d 1147, 1165 (5th Cir. 1987), vacated on other grounds sub nom. Pan American Airways, Inc. v. Lopez, 490 U.S. 1032 (1989)).  And a foreign forum "is available when the entire case and all parties can come within the jurisdiction of that forum."  Id.

Defendants argue all of these requirements are satisfied.  (Dkt. # 71 at 32–34.)  But Mexico is not an available forum for these claims as pleaded because not all the parties are within the jurisdiction of the Mexican forum.  In this case, Individual Defendants assert they "cannot be sued in Mexico and will not consent to jurisdiction there."  (Dkt. # 71 at 25 n.4.)  To avoid this issue, Defendants argue this is not a barrier to dismissal because "[I]ndividual [D]efendants are not parties to the relevant contracts, and [P]laintiffs make no allegation specific to any of the individual defendants that gives rise to any cause of action against them in an individual capacity."  (Id.)  But Plaintiffs do make allegations specifically against the Individual Defendants.  Specifically, they allege each one is a RICO person for

17

the purposes of their RICO Act claims and thus subject to liability on those counts.

(SAC at ¶¶ 106–136; Dkt. # 76 at 38.)[7]

   Dismissal for *forum non conveniens* is also not warranted

because Defendants' request is untimely.  "A defendant must assert a motion

to dismiss for *forum non conveniens* within a reasonable time after the facts

or circumstances which serve as the basis for the motion have developed and

become known or reasonably knowable to the defendant."  In re Air Crash,

821 F.2d at 1165. Although untimeliness will not strictly constitute a waiver,

"it should weigh heavily against the granting of the motion because a

defendant's dilatoriness promotes and allows the very incurrence of costs

and inconvenience the doctrine is meant to relieve."  Id.  For instance, "a

court will not be prompted to exercise its discretion in favor of a defendant

who raises the objection for the first time after the defendant has answered,

taken depositions, proceeded to pretrial and caused the plaintiff to incur

expense in preparing for trial."  Creamer v. Creamer, 482 A.2d 346, 353

(D.C. Cir. 1984).

---

[7] Whether these allegations are sufficient to survive substantive summary judgment is a separate determination.  But for the limited purpose of adjudicating the *forum non conveniens* defense, the individual defendants have not been dismissed and remain parties to the case for forum availability purposes.

Such a situation is exactly what we have here.  This case was filed nearly three year ago.  (See Dkt. # 1.)  Since the commencement of this litigation, Defendants have filed two Motions to Dismiss and a Motion for Judgment on the Pleadings, yet only now request dismissal based on *forum non conveniens*.  (See Dkt. ## 8, 21, 43, 71.)  In that time, the parties have undoubtedly engaged in extensive discovery, including depositions, and expended a lot of resources to prosecute and defend themselves in this case. Therefore, the purposes the doctrine means to serve have already been frustrated, and dismissal on this ground is not justified. Given the amount of resources expended in this protracted litigation, and the untimeliness of Defendants' request, the Court **DENIES** Defendants' Motion for Summary Judgment as to this basis.

II.     RICO Act Claims

Title 18 U.S.C. § 1964 provides a private right of action for any person harmed in their business or property because of a violation of the RICO Act.  Plaintiffs bring three separate claims under the RICO Act: (1) violation of 18 U.S.C. § 1962(b ); (2) violation of 18 U.S.C. § 1962(c); and (3) violation of 18 U.S.C. § 1962(d ).  Defendants move for summary judgment on all three claims.

Title 18 U.S.C. § 1962(b) makes it illegal for: (1) any person; (2) through a pattern of racketeering activity or through collection of an unlawful

debt; (3) to acquire or maintain, directly or indirectly, any interest in or control of any enterprise; (4) which is engaged in, or the activities of which affect, interstate or foreign commerce.  Title 18 U.S.C. § 1962(c) makes it illegal for: (1) any person; (2) employed by or associated with any enterprise;  (3) engaged in, or the activities of which affect, interstate or foreign commerce; (4) to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs; (5) through a pattern of racketeering activity or collection of unlawful debt.  And 18 U.S.C. § 1962(d) makes it illegal for: (1) any person; (2) to conspire; (3) to violate any of the provisions of subsection (a), (b), or (c) of this section.

   In addition to proving the substantive elements of each claim, to prevail on a claim under subsections (a) through (c), "[a] private RICO plaintiff . . . must allege and prove a *domestic* injury to its business or property."  RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2103, 2106 (2016).  The exact requirements for an injury to be domestic have not been firmly established, but two recent circuit court decisions provide some guidance.  Essentially, injury to tangible property located in the United States is domestic, while injury to intangible assets owned by one residing abroad is not.  See Armada (Singapore) PTE Ltd. v. Amcol Int'l, 885 F.3d 1090, 1094–95 (7th Cir. 2018); Bascunan v. Elsaca, 874 F.3d 806, 824–25 (2d Cir. 2017).  To prove such a domestic injury, Plaintiffs must show the alleged predicate RICO acts were both the factual and

proximate cause of their alleged damages.  <u>Whalen v. Carter</u>, 954 F.2d 1087, 1091

(5th Cir. 1992); <u>Ocean Energy II, Inc. v. Alexander & Alexander, Inc.</u>, 868 F.2d

740, 744 (5th Cir. 1989); <u>see also</u> 18 U.S.C. §1964(c) ("Any person injured in his

business or property *by reason of* a violation of section 1962 of this chapter may

sue therefor. . . .") (emphasis added).

   To reiterate, Defendants challenge Plaintiffs' RICO Act claims on four

primary grounds: (1) "Plaintiffs cannot prove a pattern of racketeering activity";

(2) "Plaintiffs cannot show a distinct enterprise under § 1962(c); (3) "Plaintiffs

cannot prove the elements of § 1962(d)" because they cannot prove a substantive

RICO violation; and (4) "Plaintiffs cannot prove RICO Injuries or Causation."  (<u>Id.</u>

at 35, 43, 45.)  The Court need not reach the first three arguments because, even

assuming without deciding that Plaintiffs have raised a genuine issue of material

fact as those elements of proof, Plaintiffs have failed to create a genuine dispute of

material fact on the issue of causation.[8]

  A. <u>Injuries</u>

   Because injury and causation are interconnected, the Court will

address both issues.  In this case, Plaintiffs allege domestic injuries in the form of

---

[8] Defendants' challenge to the conspiracy claim under § 1962(d) is that it fails
because it depends on the success of the §§ 1962(b) and (c) substantive claims.
(Dkt. # 71 at 45.)  Thus this argument is dealt with by addressing the arguments
directed towards the substantive claims.

lost interests, profits, and investments related to four American businesses: GAPA
USA Inc. ("GAPA"); CyE Corporation; KAAR Enterprises LLC ("KAAR
Enterprises"); Tequila Don Ramon E.C., LLC ("Tequila Don Ramon").  (SAC at
¶¶ 98–105; Dkt. # 76 at 45–47.)  The essence of Plaintiffs' allegations is that
Defendants' RICO conduct: (1) motivated Plaintiffs' business partners to cease
such business ties by negatively impacting their reputations; or (2) prevented them
from attending to their United States business interests either through intimidation
and threats or revocation of their immigration statuses.  (See SAC at ¶¶ 68–105;
Dkt. # 76 at 27–47.)  Even if these injuries constituted "domestic injuries," none of
the evidence adduced by Plaintiffs on summary judgment supports the conclusion
that Defendants' provable RICO conduct was either the factual or proximate cause
of the alleged damages.

     B.    <u>Causation</u>

     Proximate cause "requires some direct relation between the injury
asserted and the injurious conduct alleged."  <u>Torres v. S.G.E. Mgmt., L.L.C.</u>,
838 F.3d 629, 636 (5th Cir. 2016) (quoting <u>Hemi Grp., LLC v. City of New York</u>,
559 U.S. 1, 9 (2010)).  "Links that are 'indirect,' 'too remote,' or 'purely
contingent' are insufficient."  <u>Allstate Ins. Co. v. Benhamou</u>, 2016 WL 3126423, at
*4 (S. D. Tex. June 2, 2016) (quoting <u>Hemi</u>, 559 U.S. at 2).  Additionally, "the
'presence of intervening factors breaks the causal chain between predicate acts and

injury, thereby precluding a proximate cause finding.'" Andrews v. Am. Nat'l Red Cross, Inc., 176 F. Supp. 2d 673, 689 (W. D. Tex. 2001), aff'd, 44 F. App'x 651 (5th Cir. 2002) (quoting Texas Carpenters Health Benefit Fund IBEW-NECA v. Phillip Morris, 21 F. Supp. 2d 664, 674 (E. D. Tex. 1998)). "[T]he central question . . . is whether the alleged violation led directly to the plaintiff's injuries." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006).

1.    The Alleged Rico Conduct[9]

The ultimate flaw in Plaintiffs' RICO claims is that only some of the alleged predicate acts have a potentially causal link to their alleged damages. Plaintiffs allege predicate acts of fraud related to Defendants' initial investments in the Punta Mar Project as well as fraud related to Defendants' later foreclosure and takeover of the Project. (Dkt. # 76 at 29–33.) No connection, however, is ever drawn between this conduct and the domestic harms Plaintiffs allege. (See id. at 29–33, 42–47.) And no such connection makes logical sense. Frauds perpetrated in Mexico to acquire Mexican real estate share no inherent connection to and have no necessary impact on unrelated and independent American businesses. Plaintiffs make no apparent effort to argue to the contrary. These alleged frauds could not

[9] In substance, the following also represents the arguments related to the pattern of racketeering activity. But the issues raised are most directly dispositive as they relate to causation.

be, and were not, the proximate cause of the alleged damages because they did not "lead directly to the plaintiff[s'] injuries." Anza, 547 U.S. at 461.

Plaintiffs' theory of causation appears instead to be, as it must, that in the aftermath of these alleged frauds Defendants engaged in extortion and bribery, and filed of false charges in an effort to prevent Plaintiffs from defending against the takeover and asserting their rights in the Punta Mar project. As a result, Plaintiffs allege that they suffered reputational harm and were prevented from or threatened against entering the United States to attend to business here, resulting in domestic harms. (See SAC at ¶¶ 75–105; Dkt. # 76 at 42–47.) But it is for these RICO acts—extortion, bribery, and the filing of false charges—that they have presented no evidence. Each of these alleged RICO acts are discussed in turn.

i.    Extortion

In their SAC and in response to Defendants' Motion for Summary Judgment, Plaintiffs describe multiple instances of threats and intimidation they were purportedly subjected to. (SAC at ¶¶ 80, 83, 84, 86–89, 91–92; Dkt. # 76 at 35–37.) But only one of these has even a tangential connection to Defendants: an allegation in the SAC that Defendants' Mexican lawyer threatened Individual Plaintiff De La Loza and his family. (SAC at ¶ 84.) And that claim has apparently been abandoned by Plaintiffs, as it is entirely absent from their response to Defendants' summary judgment motion. In a section specifically devoted to

24

presenting evidence rebutting the argument that there is no evidence connecting Defendants to threats and extortion, no further mention is made of this Mexican lawyer, let alone of *any* threat by *any* representative of Defendants, or any evidence to this effect.  (See Dkt. # 76 at 35–37.)  The remaining threats and extortions that Plaintiffs point to are entirely unrelated to Defendants.  And, of course, Defendants have categorically denied, under oath, any knowledge of, let alone any responsibility for, any of these threats.  (Dkt. # 71 at 42; Dkt. # 78 at 18.)

For instance, Plaintiffs bring up Plaintiff De La Loza's deposition testimony about threats made to him and a picture taken of him in handcuffs by officers as he was being arrested in Miami.  (Dkt. # 76 at 35; Dkt. # 77-13, Ex. D at 5.)  According to De La Loza, the officers allegedly made threats against De La Loza's wife and demanded information about "millions of dollars" that he allegedly stole.  (Dkt. # 76 at 35; Dkt. # 77-13, Ex. D at 3.)  Plaintiffs, however, fail to explain how these threats are in any way connected to Defendants.

Plaintiffs also point to threats made, again to Castillo, by a man named Sergio Maya Aleman ("Maya").  (Dkt. # 76 at 36.)  Maya is alleged to have: (1) shown Castillo a picture of De La Loza in handcuffs; (2) made multiple assertions that De La Loza was a thief; (3) and to have stated that if Castillo did not help Maya, De La Loza's whole family could go to jail.  (Id.; Dkt. # 77-14, Ex. E at 5.)  But there is strong evidence that Maya had an independent motive.  Even in

25

the Plaintiffs' own filing, they characterize Maya, not as an agent of Defendants, but as "a former acquaintance of [De La Loza's]."  (Id.)  There is further undisputed evidence that Maya was not merely an acquaintance, but likely a jilted customer, as he had filed at least three lawsuits in Mexico against Plaintiffs alleging breach of contract related to some condos he had purchased from them. (Dkt. # 71 at 42–43; Dkt. # 71-8, Ex. 4 at 2–3; Dkt. # 71-2 at 19–22, 24–25.) Plaintiffs' own evidence demonstrates Maya believed the Plaintiffs owed him personally more than $3 million, entirely unrelated to Defendants.  (Dkt. # 77-14, Ex. E at 5–6.)

Further, Plaintiffs raise an incident where Plaintiff Leyva's wife was arrested outside her home.  (Dkt. # 76 at 36.)  Leyva's wife claims the officers detaining her asserted that she knew where two of the individual Plaintiffs were and that if she was hiding information, she would get in trouble.  (Id.; Dkt. # 77-16, Ex. G at 2.)  She also claims the officers interviewing her drew horns on a printed picture of her husband.  (Dkt. # 76 at 36; Dkt. # 77-16, Ex. G at 3.)  The Plaintiffs do not specify the department or agency, or even whether federal or state, responsible for this conduct.  (See id.)

In addition, Plaintiffs rely on evidence from Plaintiff De La Loza's wife that an officer from an unnamed agency, who had previously arrested her, made a threatening phone call describing "some people['s]" anger with her

husband and threatening to have child protective services take her children away. (Dkt. # 76 at 36; Dkt. # 77-15, Ex. F at 2.)  She also recounted an instance of being detained and shown a letter from the U.S. Embassy revoking her visa.  (Dkt. # 76 at 37; Dkt. # 77-15, Ex. F at 5–6.)  But again, a fraud related motive is not unique to the Defendants.  According to his own Lawyer, De La Loza has, or had at the time, at least seven other arrest warrants for fraud against him.  (Dkt. # 71 at 21; Dkt. # 71-34, Ex. 30 at 2.)  And Plaintiffs again fail to specify a responsible department or agency.  (See Dkt. # 76 at 36–37.)

Finally, Plaintiffs remark that on three occasions De La Loza's father, Salvador Rio De La Loza Castillo ("Castillo"), "was sent to a secondary revision at the San Antonio airport's Immigration and Customs [Enforcement] checkpoint" and, while at the checkpoint, Plaintiffs claims that Castillo was asked about his son's whereabouts and the "$35 million dollars" he had "stolen."  (Id. at 35–36; Dkt. # 77-14, Ex. E at 3–4.)  The only alleged connection between Defendants and this conduct is an assertion by Castillo that he found out from his attorney that Defendants' "lawsuit in Mexico alleged $35 million dollars in damage."  (Id.)

However, it is not entirely clear what lawsuit Castillo's attorney was referring to.  The amount of Defendants' loan to Plaintiffs was not $35 million, but just more than $21 million.  (SAC at ¶ 36; Dkt. # 71 at 13, Dkt. # 71-12, Ex. 8 at 4; Dkt. # 71-13, Ex. 9 at 3.)  And in any event, there is no evidence in the record that

27

there ever was a civil case brought in Mexico by Defendants against Plaintiffs. Instead, Defendants had filed a criminal complaint for fraud against Plaintiffs. (Dkt. # 71-28, Ex. 24.) This single confusing anecdote fails to provide a plausible basis to infer Defendants controlled the conduct of Immigration and Customs Enforcement officials at the San Antonio Airport. The non-movant must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "[A] a mere scintilla [of evidence] is not enough to defeat a motion for summary judgment." Davis v. Chevron, 14 F.3d 1082, 1086 (5th Cir. 1994).

In none of the anecdotes is mention made, let alone evidence presented, of what this conduct has to do with Defendants. (See Dkt. # 76 at 35–37.) In point of fact, Plaintiffs' response brief does not even attempt to claim Defendants were responsible for *any* this conduct, let alone provide evidence of such responsibility. (See Id.) Nor can such plausibly be inferred by means of some exclusivity of motive on Defendants' part. The undisputed evidence reveals various allegations of fraud, including criminal charges in Mexico, that have been levied by third parties against Plaintiffs in the conduct of their various business endeavors. (Dkt. # 71 at 20–22.) So, if Plaintiffs do not see fit to even allege a connection between Defendants and these threats, let alone provide evidence of such a connection, there is no reasonable basis to infer it on this absence of

evidence.  ContiCommodity Servs. Inc., v. Ragan, 63 F.3d 438, 441 (5th Cir. 1995)

("In order to defeat a properly supported motion for summary judgment, the

nonmoving party must direct the court's attention to admissible evidence in the

record which demonstrates that it can satisfy a 'fair-minded jury' that it is entitled

to a verdict in its favor.").

ii.      Bribery of Murillo Karam

Plaintiffs' next RICO allegation is that Defendants bribed Jesus

Murillo Karam, the soon to be Attorney General of Mexico's Procuraduria General

de la Republica ("PGR")—equivalent to the United States Attorney General—to

represent to United States officials that Individual Plaintiffs were criminals and that

it was a high priority for the Mexican government and him personally that they be

arrested and returned to Mexico.  (SAC at ¶¶ 64, 69, 75, 80, 85–89, 91–93; Dkt.

# 76 at 15–16.)  After Defendants' involvement in the Punta Mar Project, but prior

to their takeover, Murillo had entered into a contract to purchase a condo there.

(Dkt. # 71 at 16; Dkt. # 71-18, Ex. 14 at 4.)  According to Plaintiffs, the supposed

bribe therefore consisted of being shown special treatment in the aftermath of

Defendants' takeover of the project, as they tried to determine the rightful owners

and clear title to various condo units in the Project.  (Dkt. # 76 at 34.)  However,

Plaintiffs have failed to raise a genuine issue of material fact on every part of this

29

bribery allegation.[10]  They have presented no evidence that that Murillo was

accorded special treatment as a quid pro quo for official acts, namely

representations to United States officials.  They have presented no evidence that

Murillo ever made any representations to United States officials about the

individual Plaintiffs, and they have not even presented any evidence that Murillo

was in fact accorded special treatment.

        Plaintiffs' SAC contends that Defendants' conduct regarding Murillo

constitutes an act of bribery under both Texas and federal law.  (See SAC ¶ 108.)

In both instances, bribery requires a quid pro quo transaction, meaning the bribe

must be given in a direct and intended exchange for the doing of the official act.

United States v. Sun-Diamond Growers of Ca., 526 U.S. 398, 404–05 (1999)

("Bribery requires intent 'to influence' an official act or 'to be influenced' in an

official act . . . . In other words . . . there must be a quid pro quo—a specific intent

to give or receive something of value in exchange for an official act."); Gandara v.

State, 527 S.W.3d 261, 273 (Tex. App.—El Paso 2016) ("Implicit in Section

---

[10] The contrasts between the allegations in the SAC and the facts adduced on
summary judgment are particularly telling in this respect.  The SAC alleges a long
florid list of nefarious conduct orchestrated by Murillo, at the supposed behest of
the Defendants, pursuant to a bribe.  But on summary judgment, the only evidence
of anything remotely related to a bribe put forward by Plaintiffs is the statement of
one of their Mexican attorneys, concerning matters he lacks personal knowledge
about.  Completely absent from the record is any reference to, or any evidence for,
the machinations Murillo is supposed to have been responsible for.  (Compare SAC
at ¶¶ 64, 69, 75, 80, 85–89, 91–93, with Dkt. # 76 at 33–34.)

36.02  is the requirement of a quid pro quo. . . . ”); see also Tex. Penal Code

§ 36.02(a)(1) (“A person commits an offense if he intentionally or knowingly

offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to

accept from another any benefit as *consideration* for the recipient's decision,

opinion, recommendation, vote, or other exercise of discretion as a public servant

. . .”) (emphasis added).

Even assuming *arguendo* that it was beyond doubt that Murillo was

accorded special treatment and that he made the alleged representations to United

States officials, Plaintiffs have made no argument and have presented no evidence

that the special treatment was intended to influence, or was offered or conferred as

consideration for, the official act of liaising with various officials of the United

States.  (See Dkt. # 76 at 33–34.)

Murillo was not yet the Attorney General at the time he conveyed the

condo.  Murillo only became the Attorney General on December 4, 2012.  (SAC at

¶¶ 63–64, 67.)  But he was transferred full title to the condo on August 21, 2012.

(SAC at ¶ 64; Dkt. # 71 at 16; Dkt. # 71-22, Ex. 18.)  Murillo also paid full price

for his condo, more than two-thirds of the price paid to Plaintiffs.  (Dkt. # 71 at

16.)  And the lack of any evidence of any illicit intent precludes any inference that

title to the condo was transferred in the kind of quid pro quo exchange required to

prove bribery.  See United States v. Ward, 808 F. Supp. 803, 811 (S.D. Georgia

1992) (dismissing bribery charge for lack of evidence, including any evidence of intent.).

But there is also no evidence that Murillo made any representations to United States officials or that he was accorded special treatment.  In their SAC Plaintiffs allege Murillo, acting as Attorney General, called a meeting with "Tim Tubbs, U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) Attaché in Mexico City [, where he] . . . represented . . . that [Individual Plaintiffs] were criminals and a high priority for him and the Government of Mexico[, and] . . . requested that the United States Government utilize its official resources to pursue and arrest the [them]."  (SAC at ¶ 69.)  This allegation, along with several others alleging conduct "coordinated by the PGR under Jesus Murillo Karam," were supposed to be the connection between the Defendants and the various threatening conduct of law enforcement officials described in the previous section, as well as the revocation of their immigration statuses.  (See SAC at ¶¶ 70, 75, 85–89, 91–93.)

But "mere allegations in the complaint are not sufficient [to defeat summary judgment]; the non-movant is required to identify specific evidence in the record, and to articulate the 'precise manner' in which that evidence supported their claim."  ContiCommodity Servs. Inc., 63 F.3d at 441.  And on summary judgment, Plaintiffs present no evidence that any such meeting took place, that the

substance of the meeting was as described, or that the PGR or Murillo were responsible for any of the things for which the SAC alleges they were.  (See Dkt. # 76 at 33–34.)  Neither the meeting nor any of the other conduct is even mentioned at all in Plaintiffs' response brief.  (See id.)  Instead, Plaintiffs rely exclusively on arguing supposed special treatment was accorded Murillo.  (Id.)  But even on that score their evidence fails.

The entirety of Plaintiffs' evidence that Murillo was accorded some kind of special treatment comes from a declaration of their Mexican lawyer, Eduardo Sanchez Vivar ("Sanchez").  (See Dkt. # 76 at 34.)  Sanchez's declaration is somewhat ambiguous, but he appears to allege that Murillo was given special treatment as compared to at least some, and possibly all, of the other purported condo purchasers, because his payments were recognized and theirs were not, including three who had supposedly paid in full for their condos.  (Id.; Dkt. # 77-17, Ex. H at 18–19.)

But Sanchez's declaration is not competent summary judgment evidence.  This is because he lacks any personal knowledge concerning the substance of the protocol Defendants utilized in deciding who to transfer title to, or how that protocol was applied to the specific individuals he asserts had paid full price but were denied title.  See Fed R. Civ. P. 56(c)(4).  And the record does not support that Murillo was the only person whose payments were accepted and

33

granted title to a condo, if that is what Sanchez means to allege.  Approximately 20

other people were also conveyed title, upon similarly satisfying the same,

consistently applied protocol by demonstrating, as Murillo had, that they had paid

in full for their condo.  (Dkt. # 78 at 16; Dkt. 71-1 at 18–19; Dkt. # 71-3 at 12, 14;

Dkt. # 71-4 at 49–50.)  Nothing in Sanchez's declaration provides competent

support for the proposition that Murillo was accorded any kind of unique or

particular special solicitude as Defendants made decisions on whether or not to

transfer title to various purported buyers.[11]

In light of the foregoing, Plaintiffs have simply not presented any

evidence raising a genuine issue of material fact that the Defendants bribed Murillo

to instigate a campaign of official intimidation and retaliation against them and

their families.  See Renda Marine, Inc., 667 at 655 ("[I]mprobable inferences[] and

unsupported speculation are not sufficient to defeat a motion for summary

judgment.").

---

[11] It is also worth noting that this claim of special treatment as the bribe's
consideration is a recent iteration on the part of the Plaintiffs.  Their initial theory
of the bribe was that Murillo was simply given the condo.  (See SAC at ¶ 64.)  It
was only when the evidence later turned out to conclusively demonstrate that
Murillo had paid full price for it, just more than two-thirds of which was paid to
the Plaintiffs themselves, that the theory morphed into what is discussed above.
(See Dkt. # 76 at 16; Dkt. # 76 at 34.)

iii.        Filing False Charges and Bribing the Prosecutor

Plaintiffs' final RICO allegation is that Defendants, through their

Mexican attorney, filed false charges of fraud and theft against them in Mexico.

(SAC at ¶¶ 56, 68.)  Plaintiffs further allege that Defendants bribed a Mexican

prosecutor "to expedite and secure [such charges] outside the performance of a

routine government action" and also bribed the president of the local court system

in Mexico City "to issue an arrest warrant, knowingly without merit" against the

individual Defendants.  (Id. at ¶¶ 73–74.)  Defendants, of course, deny any such

bribery took place and argue that no evidence in the record supports this allegation.

(Dkt. # 71 at 41–42; Dkt. # 78 at 17.)

Perhaps recognizing the evidentiary shortcomings, Plaintiffs devote

only one brief paragraph in their response to this claim.  (See Dkt. # 76 at 34–35.)

Their sole argument is that because the arrest warrants were ultimately dismissed

on appeal, "[a] reasonable inference may be drawn from the circumstances that the

warrants were issued pursuant to special treatment or bribery of Mexican officials."

(Id. at 35.)  But in a well-functioning judicial system, criminal charges are

dismissed, on appeal and in other procedural postures, every day and for a wide

variety of reasons.

And none of Plaintiffs alleged bribery or collusion in appealing the

warrants.  (Dkt. # 71-2 at 55; Dkt. # 71-30, Ex. 26; Dkt. # 71-31, Ex. 27; Dkt.

35

# 71-32, Ex. 28; Dkt. # 71-33, Ex. 29.)  Nor did the Mexican appellate decisions vacating the warrants mention anything about bribery or collusion.  (Id.)  The evidence clearly indicates the arrest warrants were overturned on purely technical grounds, due to a lack of evidence.  (See id.)  Such dismissals are altogether common in criminal courts.  The naked fact of dismissal, without more, fails to provide any evidence of bribery or misconduct.

Thus, even drawing all possible reasonable inferences in favor of Plaintiffs, there is no genuine issue of material fact as to whether Defendants actually committed the alleged RICO predicate acts that could have factually and proximately caused the domestic damages that Plaintiffs allege.  See Forsyth v. Barr, 19 F.3d 1527, 1537) (holding that "offer[ing] only vague, conclusory assertions . . . are insufficient to preclude summary judgment").

2.    The Alleged RICO Harms

The undisputed evidence on summary judgment further demonstrates that in each instance the harms Plaintiffs complain of were the result of extrinsic factors unrelated to the any conduct of Defendants.

i.    Domestic Injuries Related to GAPA.

GAPA USA, Inc. ("GAPA") is a U.S. distributor and marketer of food products for a Mexican parent company.  (Dkt. # 71 at 24, Dkt. # 71-43, Ex. 39 at 4).  GAPA originally had four partners, each holding a position as an officer.  (Dkt.

36

# 71 at 24.)  Plaintiff  Leyva was the company's majority shareholder, CEO, and president.  (Id.; Dkt. # 71-43, Ex. 39 at 5.)  Leyva asserts he made an initial investment in GAPA of $250,000.  (Dkt. # 76 at 45; Dkt. # 77-8, Ex. C at 14.)  But that as a result of "very public charges" brought against him by Defendants, "Venders stopped selling to GAPA USA[,] . . . the business could no longer operate[, and he] lost [his] salary, share of profits, and all [he] invested in this company."  (Dkt. #  76 at 45; Dkt. # 77-8, Ex. C at 14.)  However, all the evidence is to the contrary.

Leyva claims "[the problems began when [he] was detained by customs agents."  (Dkt. # 77-8, Ex. C at 14; see also Dkt. # 76 at 45.)  This detention occurred in October 2012, as he was attempting to return to the United States from Canada.  (Dkt. # 71 at 24.)  The problem, it seems, was that his immigration Visa had been revoked on May 18, 2012, and he lacks a valid visa or other means of entering the United States.  (Dkt. # 71 at 24, Dkt. # 71-5, Ex. 1 at 7; see also Dkt. # 71-27, Ex. 23 at 4.)  And there is no evidence Defendants are in any way responsible for the revocation.

The revocation thus occurred before alleged bribe target Murillo—presumably the person Plaintiffs must insinuate instigated the revocation for Defendants to be responsible—became Attorney General on December 4, 2012.  (See SAC at ¶ 67.)  It was thus necessarily before his alleged meeting with Tom

Tubbs.  (See Id. at ¶ 69.)  It also occurred before Murillo was transferred title to the condo that allegedly constituted the bribe on August 21, 2012.  (Id. at ¶ 64; Dkt. # 71 at 16; Dkt. # 71-22, Ex. 18.)  It was further before Murillo even became involved in former President Peña Nieto's transition team on July 11, 2012.  (SAC at ¶ 62.)  And directly contrary to Leyva's story, it was nearly 10 months prior to Defendants filing a criminal fraud complaint against the Defendants on January 8, 2013.  (Dkt. # 71 at 19; Dkt. # 71-28, Ex. 24 at 13.)  And it was more than a full year prior to an arrest warrant being issued against Leyva related to that complaint on July 25, 2013.  (Dkt. # 71 at 19; Dkt. # 71-29, Ex. 25 at 6.)  But it was not prior to at least 3 other charges brought in Mexico against Levya by parties entirely unrelated to the Defendants.  (Dkt. # 71 at 20–21.)

    And even Leyva's own declaration undermines his claim.  In his declaration, Leyva states Canadian police contacted his suppliers and told them about the charges.  (Dkt. # 76 at 45, Dkt. # 77-8, Ex. C at 14.)  How Defendants are possibly responsible for this conduct, assuming it even occurred, is never mentioned.  (See id.)  So even by Leyva's own story, it is the Canadian authorities, and not the Defendants, that are most directly responsible for the disrepute he alleges cost him his business, GAPA.

ii.     Domestic Injuries Related to TDR

Tequila Don Ramon E.C. LLC ("TDR") is a Florida company

organized by De La Loza's wife and a man named Boris Alvarado in January 22,

2013, for the purposes of distributing Don Ramon tequila in the eastern United

States.  (Dkt. # 71 at 25, 50; Dkt. # 71-54, Ex. 50 at 9–10.)  Although not identified

as an owner, officer, or business contributor in TDR's public filings, (Dkt. # 71 at

25.; see e.g. Dkt. # 71-55, Ex. 51; Dkt. # 71-58, Ex. 54.), the distribution contract

with Don Ramon producer Vela J-26, S.A. De C.V was entered into by De La Loza

personally.  (Dkt. # 71 at 25; Dkt. 71-54, Ex. 50 at 14.)  The contract calls for an

investment by De La Loza of $450,000, and De La Loza states he invested

$419,000.  (Dkt. # 71 at 50; Dkt. # 71-54, Ex. 50 at 10; Dkt. # 76 at 47; Dkt.

# 77-13, Ex. D at 5.)  Though the only financial records TDR produced in

discovery do not appear to indicate any personal investment on De La Loza's part.

(Dkt. # 71 at 50; Dkt. # 71-59, Ex. 55 at 6.)

De La Loza's claim is that, as a result of a detention he suffered at the

hands of the Department of Homeland Security and threats against employees

made by officers of various agencies[12] during a search of TDR's business premises,

---

[12] Plaintiffs claim those agencies were FBI, DHS and Interpol.  (Dkt. # 77-13, Ex.
D at 4.)  Defendants' evidence indicates it may have been FBI, INS, and IRS, with
a separate search of one employee's home by federal agents related to an Interpol
search for De La Loza.  (Dkt. # 76 at 25.)  Whatever the identity of the agencies
actually involved, this inconsistency is immaterial.

employees decided to quit, leaving the business no longer able to operate and costing him his share of profits as well as his investment.  (Dkt. # 76 at 47; Dkt. 77-13, Ex. D at 6.)

Leaving aside that businesses can hire new employees to replace those that leave for whatever reason, De La Loza presents no evidence that Defendants are responsible for or directed the conduct of officers and governmental agencies in question.  (See Dkt. # 76 at 47.)  De La Loza was initially detained by DHS on July 20, 2013.  (Dkt. # 71 at 25; Dkt. # 71-6, Ex. 2 at 6.)  This was five days before any arrest warrant was issued against him in Mexico relating to Defendants' criminal complaint.  (Dkt. # 71 at 19, 25; Dkt. # 71-29, Ex. 25 at 6.)  Further, it was the result of his visa having been revoked on August 14, 2012.  (Dkt. # 71 at 25, Dkt. # 71-6, Ex. 2 at 6.)  Plaintiffs do not allege or provide any evidence for Defendants' responsibility for this revocation.  (See Dkt. # 76 at 47.)

In any event, the employees of TDR who resigned in the second half of 2013 explained that it was the search of TDR's offices, along with a visit to one employee's home to look for De La Loza, that caused their resignations.  (Dkt. # 71 at 25.)  This search was also prior to any arrest warrant issued against De La Loza in Mexico in connection with the criminal complaint filed by Defendants. (Dkt. # 71 at 19, 25, 50–51; Dkt. # 71-29, Ex. 25 at 6.)  But at the time, De La Loza did apparently have at least seven other arrest warrants and criminal actions

pending against him in Mexico, unrelated to the one filed by Plaintiffs, many of which remain outstanding to this day.  (See Dkt. # 71 at 51; Dkt. # 71-34, Ex. 30 at 3.)

                iii.         <u>Alleged Domestic Injuries Related to CyE.</u>

CyE Corporation ("CyE") was formed on June 9, 2011, for the purposes of developing a Mexican Restaurant.  (Dkt. # 71 at 22–23; Dkt. # 71-37, Ex. 33 at 1, 4; Dkt. # 76 at 46; Dkt. # 77-3, Ex. A at 18.)  To that end, CyE purchased two lots of land in San Antonio in December 2011.  (<u>Id.</u>)  The restaurant is almost entirely built, yet has not opened.  (Dkt. # 77-3, Ex. A at 14.)  Plaintiff Karam claims that he was responsible for the business plan, the design of the menu, and the layout of the restaurant, among other things.  (Dkt. # 76 at 46; Dkt. # 77-3, Ex. A at 22–23.)  He was also to be the day-to-day manager of the restaurants operations.  (Dkt. # 76 at 46; Dkt. # 77-3, Ex. A at 25–26.)  Yet because the bank closed his accounts and he has been unable to enter the United States since August 2013, Karam claims damages due to being unable to open the restaurant.  (Dkt. # 76 at 46; Dkt. # 77-3, Ex. A at 39–40.)

Karam had originally entered the United States around June 2011, under his wife's E-2 investor visa.  (Dkt. # 71 at 19, Dkt. # 71-2 at 10, 30–31.)  He was later detained on August 21, 2013, for being in the country illegally because his wife's visa and I-94 permit had expired.  (Dkt. # 71 at 22; Dkt. # 77-2, Ex. A at

123.)  Karam agreed in November 2013 to voluntarily return to Mexico to deal with pending criminal proceeding against him there.  (Dkt. # 71 at 22; Dkt. # 77-2, Ex. A at 130, 132.)  Upon arrival in Mexico, he was arrested on charges unrelated to Defendants, though he did eventually spend two years incarcerated in Mexico related to Defendants' charges prior to that arrest warrant being overturned.  (Dkt. # 71 at 22.)  But there is no evidence Karam could have legally returned to the United States even if he were at liberty and had wanted to.  Karam has been the subject of at least five separate arrest warrants for fraud in Mexico.  (Dkt. # 71 at 49; Dkt. # 71-35, Ex. 31.)  He has continuously lacked immigration privileges since the expiration of his wife's investor visa and his voluntary return to Mexico. (Dkt. # 71 at 49.)  To even attend his deposition in this case, Karam required a special visa to cross the border and was monitored by border patrol during his entire time in the United States.  (Dkt. # 71 at 23, 49; Dkt. # 77-2, Ex. A at 7–8.)

### iv.     Alleged Domestic Injuries Related to KAAR.

KAAR Enterprises LLC ("KAAR") is a business formed to buy and sell used cars.  Plaintiff Karam formed the business with another man, Arturo Arakelian in October of 2012.  (Dkt. # 71 at 23; Dkt. # 76 at 46.)  Each man contributed $500 in capital to the business, and in exchange each received a 50% interest in the compnay.  (Id.)  Following Karam's immigration detention in August 2013, Arakelian cut business ties with Karam, keeping the business for

himself.  (Dkt. # 71 at 23, 49; Dkt. # 76 at 46.)  Karam claims Arakelian's decision

was in response to ICE agents detaining Arakelian on several occasions and

threatening to accuse him of money laundering if he did not tell them where

Plaintiff De La Loza was located.  (Dkt. # 76 at 46; Dkt. # 77-3, Ex. A at 45–47.)

   With respect of each of these four businesses, the undisputed evidence

leaves no alternative conclusion but that Plaintiffs' harms were both factually and

proximately caused by people and factors entirely unrelated and extrinsic to any

conduct Defendants are responsible for.  In each instance, Plaintiffs themselves

identify the causally responsible parties as various governmental entities and their

agents or disaffected business partners.  (See Dkt. # 76 at 34–39.)  No connection

is drawn or evidence presented that Plaintiffs are factually or proximately

responsible for these actions.  (See Id.)

   So for the foregoing reasons, this Court must find that Plaintiffs have

not shown Defendants factually or proximate caused any of Plaintiffs' alleged

domestic RICO harms.  Because Plaintiffs have thus failed in their burden to

demonstrate they were "injured in [their] business or property *by reason of* a

violation of [the RICO Act]" attributable to Defendants, 18 U.S.C. § 1964(c)

(emphasis added), Defendants are entitled to summary judgment on Plaintiffs'

RICO claims.  See ContiCommodity, 63 F.3d at 441 ("[S]ummary judgment is

proper against the nonmoving party when the nonmoving party 'fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (quoting Celotex, 477 U.S. at 321).  Because Plaintiffs cannot prove the required causation element of a civil RICO Act claim, the Court declines to address Defendants alternative arguments regarding the pattern of racketeering activity[13] and distinct enterprise elements.

III.    Plaintiffs' State Law Claims

        Defendants also move for summary judgment on Plaintiffs' remaining state law claims for fraud and civil conspiracy under Texas law on the ground that neither of these claims are supported by the evidence and that each is also time-barred.   (Dkt. # 71 at 51–54.)  Each claim is addressed in turn.

        A.    Fraud Claim

        Plaintiffs allege that Defendants perpetrated a variety of frauds, including "in acquiring and maintaining [an] interests in Punta Mar . . . , pleadings and representations before the Mexican legal system, and in their communications to U.S. Government officials."  (SAC at ¶ 130.)  However, under Texas common law, to prevail on a fraud claim, the plaintiff must allege and prove: (1) material misrepresentations were made by the defendant; (2) with knowledge of its falsity or reckless disregard for its truth; (3) with the intent to induce plaintiff's reliance;

---

[13] Except to the extent necessary for reaching the causation conclusion.

and (3) that he did in fact justifiably rely on those misrepresentations to his detriment.  Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001).

Regarding alleged misrepresentations made to the Mexican legal system or to the United States government officials about actions or crimes committed by the Plaintiffs, any alleged misrepresentations would certainly have been made with the intent of inducing action on the part of those to whom the representations were made, not the Plaintiffs.  Plaintiffs have presented no evidence to the contrary.  (See Dkt. # 76 at 39–46.)  And in any event, any reliance by the Plaintiffs on misrepresentations of their own conduct by others would be clearly unjustifiable.  Thus, the only alleged fraud that is actionable by Plaintiffs concerns their Punta Mar transactions with Defendants.

The essence of Plaintiffs' actionable fraud claim is that Defendants fraudulently misrepresented their intentions in negotiating and structuring their investment in the project.  (See Dkt. # 39 at 8–10; Dkt. # 76 at 29–32, 40–42.)  Plaintiffs' assert Defendants represented that their investment would be only superficially structured, "disguised," as a debt investment for tax purposes and to in truth be treated for all practical purposes as an equity investment.  (Dkt. # 76 at 31.)  Plaintiffs claim that:  (1) this representation was knowingly false when it was made; (2) it was intended to induce the Plaintiffs to sign the various contract

documents constituting the loans to the Punta Mar project; and (3) Plaintiffs relied on that representation in agreeing to the debt structure and were then harmed when Defendants used the loan to foreclose on their interest in the Project.  (SAC at ¶¶ 34–46, 137–143; Dkt. # 76 at 29–32, 40–42); <u>see also</u> <u>Ernst & Young</u>, 51 S.W.3d at 577 (outlining the elements of Texas common law cause of action for fraud).  As alleged, however, this claim is conclusively time-barred.

The statute of limitations in Texas for fraud claims in four years.  Tex. Civ. Prac. & Rem. Code § 16.004(a)(4).  Even under the discovery rule or the doctrine of fraudulent concealment, fraud claims accrue at the latest when Plaintiffs discover or should have discovered the fraud.  <u>BP Am. Prod. Co. v. Marshall</u>, 342 S.W.3d 59, 65 (Tex. 2011) ("Under . . . the discovery rule, the cause of action does not accrue until the injury could reasonably have been discovered."); <u>Velsicol Chem. Corp. v. Winograd</u>, 956 S.W.2d 529, 531 (Tex. 1997) ("As with the discovery rule, [the fraudulent concealment] doctrine tolls the statute until the fraud is discovered or could have been discovered with reasonable diligence.").

Given Plaintiffs' fraud theory and the evidence, the only reasonable conclusion is that they knew or should have known a fraud had been perpetrated on them when Defendants treated the transaction as a true, not "disguise," loan by accelerating the loan on February 16, 2010.  (<u>See</u> SAC ¶¶ 50–51; Dkt. # 71 at 15, 39.)  At the very latest, Plaintiffs should have discovered the fraud in late May

2010, when their powers of attorney to act on behalf of the land trusts that

controlled the project were terminated, and they learned they were to be replaced

on the technical committee that made decisions for the land trusts.  (See id.)

Plaintiffs' own evidence supports this conclusion, as Plaintiff Leyva states in his

declaration that "[d]uring the time when Defendants attempted to remove us from

the technical committee, we began to question all the representations they had

made about their intent to participate, in good faith, as a partner in the

development."  (Dkt. # 77-8, Ex. C at 13.)

   And this conclusion is further supported by the fact that at least two of

the lawsuits by Plaintiffs against Defendants in Mexico assert essentially the same

premises as the instant fraud claims.  (Dkt. # 71 at 53.)  The first lawsuit—filed on

July 15, 2010, and eventually dismissed in Defendants' favor—alleged fraud in

relation to Defendants' foreclosure and takeover of the condo project.  (Dkt. # 72 at

2–3.)  The second—filed on September 22, 2010, and still pending—alleged

misrepresentations made by Defendants' representatives induced them into the debt

relationship under the false pretenses of an equity relationship.  (Id. at 5.)

Plaintiffs had until May of 2014 to file a timely fraud claim on these facts,

something they failed to do.

   Plaintiffs' arguments to the contrary are not persuasive.  It may well

be true, as Plaintiffs argue, (Dkt. # 76 at 53), that "[t]he determination of when the

fraud might have been discovered through the exercise of reasonable diligence is generally an issue of fact." Benamou v. Wells Fargo Bank Nat'l Assoc. for Carrington Mortg. Loan Trust, No. 3:16-CV-401-LBK, 2017 WL 1394949, at *3 (N.D. Tex. Feb. 5 2017) (citing Hooks v. Samson Lone Star, Ltd. P'ship, 457 S.W.3d 52, 58 (Tex. 2015). "But if a party is aware of their injury and that it was likely caused by the wrongful acts of another, then the limitations period commences." Id. (citing Lazo Techs., Inc. v. Hewlett-Packard Co., No. 05-14-1060-CV, 2016 WL 80952, at *3 (Tex. App.—Dallas 2016, pet. denied)).  As does the limitations period commence "where a plaintiff has actual or constructive notice, such as when information is readily accessible and publicly available." Id. (citing Hooks, 457 S.W.3d at 58).

In this case, Plaintiffs certainly became of aware of and had actual notice of their alleged injury due to the allegedly wrongful acts of Defendants when the supposed disguise loan was accelerated and their powers of attorney were revoked.  Once again, their commencing litigation in Mexico over nearly identical allegations confirms this necessary conclusion.

For these same reasons, Plaintiffs' attempts to argue they did not become aware of the fraud until Murillo registered his Punta Mar condo in 2014 are unavailing.  (See Dkt. # 76 at 53–54.)  Defendants' alleged bribe of Murillo is entirely beside the point.  Plaintiffs' fraud theory is that they were deceived about

the Defendants' intents with respect to treating their investment as a loan and not an equity investment.  (SAC at ¶¶ 34–46, 137–143; Dkt. # 76 at 29–32, 40–42.)  As discussed above, what revealed that deception was Defendants in fact treating the loan as a loan by accelerating it, foreclosing on the property, and revoking the powers of attorney.  So even under Plaintiffs' theory of the case, they knew or should have known a fraud had been perpetrated against them in May of 2010 at the latest.  Any bribe of Murillo is not revelatory of that particular deception, especially since the bribe did not even allegedly occur until 2012, after Defendants had taken over the Punta Mar project.  (SAC at ¶¶ 50–54, 64; Dkt. # 71 at 15, 39.)  Plaintiffs do not even allege the bribe was connected the original Punta Mar transactions that form the substance of their actionable fraud claims.  Plaintiffs instead allege Murillo "was bribed to pursue arrests warrants against the Plaintiffs" in the aftermath of Defendants foreclosure on the project.  (See SAC at ¶64; Dkt. # 76 at 29.)

Finally, Plaintiffs' reliance on this Court's decision denying judgment on the pleadings for the fraud claim is similarly unavailing.  (See Dkt. # 56 at 23–28; Dkt. # 76 at 51.)  The Court in so deciding was concerned with Defendants' failure to show that the discovery rule and fraudulent concealments doctrine did not apply and their failure to show as a matter of law that Plaintiffs knew or should have known in 2007, at the time it was executed, that the "disguise" loan was a

loan is substance, not just in form.  (Dkt. # 56 at 26–27.)  In now holding that the fraud claim is time barred, the Court bases its decision on a different analysis, as well as a different legal standard.

The Court is instead saying today, as discussed above, that even applying the discovery rule and the fraudulent concealment doctrine, there is no genuine issue of material fact about the fraud becoming discoverable in the first half of 2010, based on Defendants' conduct in foreclosing the loan and revoking the powers of attorney.[14]  In fact, even in reaching that prior conclusion the Court's explanation supports its present conclusion.  As court explained previously, "the SAC alleges that[] it was . . . when Defendants attempted to . . . clawback the loan and assert ownership rights to displace Plaintiffs pursuant to . . . financial restructuring deals, that Plaintiffs began to question Defendants' representations (or omissions) and start to attempt to invalidate Defendants' actions."  (Dkt. # 56 at 27.)

Thus, for the foregoing reasons the Court finds that Plaintiffs' claim for state-law fraud is conclusively time-barred, and Defendants are entitled to judgment on that claim as a matter of law.  Having so found, the Court declines to

---

[14] And given that Plaintiffs' claims are time-barred, even applying the discovery rule, their arguments about there being a fiduciary relationship are irrelevant.  (See Dkt. # 76 at 52–53.)  The existence of a fiduciary relationship only goes to the "inherently undiscoverable" prong for determining whether the discovery rule properly applies.  See S.V. v. R.V., 933 S.W.2d 1, 8 (Tex. 1996).

address Defendants' alternative argument that the fraud claim is unsupported by the evidence.  (See Dkt. # 71 at 51–52.)

      B.    Civil Conspiracy Claim

        The Court now turns to Plaintiffs' civil conspiracy claim.  The statute of limitations in Texas is two years for civil conspiracy.  Stroud v. VBFSB Holding Corp., 917 S.W.2d 75, 82 (Tex. App.—San Antonio 1996).  And it begins to run "when facts come into existences that authorize a claimant to seek a judicial remedy."  Exxon Corp. v. Emerald Oil & Gas Co., L.C., 348 S.W.3d 194, 202 (Tex. 2011).  Moreover, "[c]ivil conspiracy . . . [is] a derivative tort," meaning "a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable."  Tilton v. Marshall, 925 S.W.2d 672, 681 (Tex. 1996).

        As the fraud claim is the only underlying tort claim remaining after Defendants' Motion for Judgment on the Pleadings, (see Dkt. # 56 at 28–33), Plaintiffs' civil conspiracy claim is tied to that claim.  Therefore the same facts underlie both claims.  And as was the case with the fraud claim, Plaintiffs' became aware of the facts authorizing them to seek judicial remedy for civil conspiracy at the latest in May 2010, at the same time and for the same reasons they discovered the fraud claim.  It was no later than at that time that Plaintiffs would have become aware of a supposed combination on the part of Defendants to accomplish the

51

*unlawful* purpose of defrauding them out of their interests in the Punta Mar development project.  See <u>Ins. Co. of N. Am. v. Morris</u>, 981 S.W.2d 667, 675 (Tex. 1998) (describing the elements of Texas common law cause of action for civil conspiracy).  Therefore the statute of limitations elapsed for Plaintiffs' civil conspiracy claim no later than in May of 2012.

Thus, the Court finds that Plaintiffs' claim for state-law civil conspiracy is conclusively time-barred, and Defendants are entitled to judgment on that claim as a matter of law.  Having so found, the Court declines to address the Defendants' alternative arguments that the civil conspiracy claim fails either because there is no evidence to support the fraud claim it is derivative of or because it is independently unsupported by the evidence.  (<u>See</u> Dkt. # 71 at 54.)

<u>CONCLUSION</u>

Based on the foregoing, the Court **GRANTS** Defendants' Motion for Summary Judgment.  (Dkt. # 71.)  The Clerk is **INSTRUCTED** to **ENTER JUDGMENT** and **CLOSE** the case.

**IT IS SO ORDERED.**

**DATED:** San Antonio, Texas, September 14, 2018.

DAVID ALAN EZRA
SENIOR UNITED STATES DISTRICT JUDGE